(No. 11370.—Reversed and remanded.)
LORENZ BUGNER, Appellant, *vs.* THE CHICAGO TITLE AND
TRUST COMPANY *et al.* Appellees.

*Opinion filed October 23, 1917—Rehearing denied Dec. 7, 1917.*

1. LIMITATIONS—*when possession will ripen into title under the twenty year statute.* For a possession of land to ripen into a title under the twenty year Statute of Limitations the proof must show that the claimant and those under whom he holds possession and claims title have been in the actual, open and continuous possession of the property for twenty years or more prior to the filing of the suit, under a claim of ownership inconsistent with the claim of the holder of the record title.

2. SAME—*title acquired by adverse possession is available for attack as well as for defense.* A title acquired by adverse possession under the twenty year Statute of Limitations may be used as the basis for a bill in equity to remove a cloud, as the bar of the statute in such case is just as available for attack as for defense.

3. SAME—*what acts are sufficient to show possession of land claimed under twenty year statute.* It is not necessary that land should be enclosed with a fence or that a house should be erected upon it or that it should be reduced to cultivation to constitute possession under the twenty year Statute of Limitations, but such improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who has the exclusive control and management of the land are sufficient.

4. SAME—*possession is continuous where grantee succeeds to possession of grantor.* If each grantee of land succeeds to the possession of his grantor there is such privity between the occupants that their several possessions are regarded as continuous under the twenty year statute.

5. SAME—*continuous possession of land cannot be broken by unlawful entry.* The continuous possession of one who claims title to land under the twenty year Statute of Limitations cannot be broken in a way not recognized by law.

6. FORCIBLE ENTRY AND DETAINER—*entry need not be made with actual force to constitute forcible entry and detainer.* To constitute forcible entry and detainer under the statute it is not essential that the entry be accompanied by acts of actual force or violence against either person or property, but if one invades the possession of another against the will of the occupant, however quietly he may do so, the entry is forcible in legal contemplation.

Appeal from the Superior Court of Cook county; the Hon. Martin M. Gridley, Judge, presiding.

Vincent D. Wyman, Harry C. Kinne, and Charles E. Carpenter, for appellant.

Ringer, Wilhartz & Concannon, Charles L. Bartlett, and Sherman C. Spitzer, for appellees.

Mr. Justice Duncan delivered the opinion of the court:

On June 16, 1914, appellant, Lorenz Bugner, filed his petition under the Burnt Records act praying that title to the following premises be established, restored and confirmed, and for further relief, to-wit: That part of the fractional northeast quarter of the southwest quarter lying south of the Indian boundary line, in section 36, town 41, north, range 13, east of the third principal meridian, in Cook county, containing 24.87 acres, more or less. On June 25, 1914, an amended petition was filed describing said property by metes and bounds, to which an answer and a cross-petition were filed by the Chicago Title and Trust Company and an answer was filed by other defendants. On August 23, 1915, by leave of court appellant filed an amended bill changing the cause of action to a bill in equity to remove a cloud, in which it is averred that he is owner in fee simple of said land, more particularly described as follows: Beginning at a point 1320 feet north of the southeast corner of the southwest quarter of said section; running thence north 1217.5 feet to a stake 4.69 feet west of the east line of said southwest quarter as occupied; thence southwesterly 1557.26 feet; thence south on the west line of the northeast quarter of the southwest quarter 420.48 feet; thence east on the south line of the northeast quarter of the southwest quarter to the beginning, 1329.23 feet, except the part of California avenue included therein, if any. It is further

averred in the amended bill that appellant and those through whom he claims have been in the actual, open, peaceable, undisputed, exclusive, continuous, uninterrupted, notorious, hostile and adverse possession and occupation of said premises and claiming ownership of the same in good faith for over fifty years last past; that the parties defendant to the bill, the Chicago Title and Trust Company, as trustee, Barbara Probst, Peter and Edward Hamich, Ernst Stock, individually and as trustee, and Clarence W. Hubbard, claim title to that part of the tract described in the amended bill included in this boundary, to-wit: Beginning at the northwest corner of said tract; thence southwesterly on the north line thereof to the west line thereof; thence south along the west line thereof 47.50 feet, more or less, to what is known as the true Indian boundary line; thence northeasterly along said Indian boundary line to the west line of California avenue; thence north 47.50 feet, more or less, to the place of beginning. Appellees, the Chicago Title and Trust Company, trustee, Ernst Stock, individually and as trustee, and Clarence W. Hubbard, filed a joint and several answer to the bill, and the Chicago Title and Trust Company filed a cross-bill to said amended bill, which was afterwards dismissed without prejudice. Peter and Edward Hamich made default, and the amended bill was dismissed as to Barbara Probst. Replication was filed to the answer of appellees and the cause was heard in open court before the chancellor. A decree was entered January 23, 1917, finding that complainant was the owner in fee simple of that part of the said premises south of the Indian boundary line; that the Chicago Title and Trust Company, as trustee, is the owner in fee simple of the disputed strip north of the Indian boundary line, subject only to a passageway reserved in a certain deed of one of the grantors, Nicholas Breit, dated May 29, 1876, and subject to the rights of the city of Chicago and the public in the streets and alleys in said disputed strip shown by a certain plat of Sallinger &

Hubbard's subdivision to Rogers Park and to the rights of the public and the city of Chicago in so much of said premises as have been dedicated, taken or used for North California avenue and Pratt avenue, in said city, and subject also to a trust deed from Clarence W. Hubbard to Ernst Stock, dated February 27, 1914, and to the provisions of a certain trust agreement dated May 21, 1914, under the terms of which the Chicago Title and Trust Company, as trustee, claims to hold said premises. The decree also by its provisions locates the Indian boundary line, and finds that at the commencement of the suit neither the appellant nor any person or persons with whom he is in privity had been in the actual, adverse, visible, notorious, exclusive and continuous possession for a period of twenty consecutive years under claim or color of title of any part of the disputed strip lying north of the Indian boundary line. From that decree this appeal was prosecuted.

There was at no time any claim in this case that the appellant was not the absolute owner in fee simple of all the premises described in the amended bill situated south of the Indian boundary line. The sole question is as to the rights of the parties in the strip north of the Indian boundary line. The main question in the case is therefore simply one of fact. If the proof shows, as contended by appellant, that he and those under whom he holds possession and claims title have been in the actual, open, adverse and continuous possession of said disputed strip for twenty years or more prior to the filing of this bill, under a claim of ownership inconsistent with the claim of ownership of the holder of the record title, such possession has ripened into a title and appellant is entitled to have the same confirmed and all clouds upon it removed. (*Horner* v. *Reuter,* 152 Ill. 106; *Littlejohn* v. *Barnes,* 138 id. 478; *Mason* v. *Odum,* 210 id. 471.) When this test is applied, if the record does not establish all those conditions appellant must fail, as it is admitted that the record title to said disputed

strip is in the Chicago Title and Trust Company, trustee, subject to the rights set forth in the decree. If those conditions are proven appellant cannot be defeated on the ground that a title gained by twenty years' possession under the Limitation statute can only be used for defensive purposes. It is the settled doctrine in this State that such a title may be used as the basis for this kind of·a suit, as the bar of the statute in such cases is just as available for attacking as for defensive purposes. *McDuffee* v. *Sinnott,* 119 Ill. 449.

There is no theory upon which the finding and decree of the court can be sustained that neither appellant nor any person with whom he is in privity has been in the actual, adverse, visible, notorious, exclusive and continuous possession for a period of twenty consecutive years prior to the bringing of this suit, under a claim of title to any part of said disputed strip. There is no testimony in the record that is really inconsistent with his claim and proof that he has established his title to at least a considerable portion of said strip. The learned chancellor who tried the cause must have necessarily decided the issues upon an erroneous view of the law, as hereinafter indicated, in reaching his conclusions.

Appellant was sixty-three years of age when this cause was tried. The evidence admitted by appellees proves that John Bugner, father of appellant, became the owner in fee simple of the part of the northeast quarter of the southwest quarter lying south of the Indian boundary line by virtue of a warranty deed executed February 25, 1850, by Alexander McDaniel and wife, then owners in fee simple thereof, and that the appellant became the owner in fee simple thereof by virtue of two deeds executed and delivered to him in November and December, 1880, by his father, John Bugner. Appellant testified, in substance, that he was first on the land in 1863, when he was·ten years old,'and that he helped his father make hay on said premises in the summer time, including the disputed strip of land, and occasion-

ally looked around the land to see that the fences were all in order; that from 1863 to 1871 he was on the land every summer, and that all of said land, including the disputed tract, was fenced during that time as one tract; that the fence on the north line was on the line then reputed in that vicinity to be the Indian boundary line; that he was not on the land very often from 1871 up to the time he obtained title to it; that the fence, which was a board fence, was taken down by him in 1882, except some of the posts, which remained there on the north line; that there was no fence on that north line from 1882 until 1906, when he built the present fence which is now on that line, and that he has claimed to be the owner of all of said land south of that line from 1880 up to the time of filing the bill in this case. He further testified that between the years 1871 and 1880 Peter Irmiter had all the land rented from his father, and that during that time Irmiter dug a ditch on the entire south side of that old north fence line from twelve to eighteen inches deep and about eighteen inches wide and about two feet south of and parallel with the fence, to keep the water from coming onto the land; that that same ditch is there to-day and that its bank is still about a foot high; that ash trees, willows and other brush have since grown up along that line of fence and on the bank just south of it and between it and the ditch that still identify the old fence line, and he thinks that one or more of the ash trees and small bushes are still there that were there in 1882. He also testified that in 1881 his father left the land and never was on the land afterwards; that he (appellant) took possession of it in 1881, and that he has continued in possession of it, claiming to be the owner thereof, ever since that time up to the taking of his testimony in this case and worked regularly on the land during that time; that he took wild hay off the land in 1881, and in 1882 commenced breaking up the ground and tilling it, first breaking up three acres in the southeast corner thereof; that he continued to

280 — 40

break up more and more of the land each year until 1887, when he broke up and cultivated the entire tract up to the ditch; that he rented out the south ten acres of the tract, but has continually cultivated and planted the north part thereof from 1887 down to and including the time of the trial, raising cabbage, tomatoes, potatoes, corn and other crops that could be used and marketed, and cultivated the same every year up to the ditch south of the present fence, which is on the same line as the old north fence that his father built; that in 1886 he and other adjoining land owners employed one Foster, county surveyor, to locate the Indian boundary line and to survey their lands, and that Foster put stakes at the northeast, northwest, southeast and southwest corners of the property, including said strip, and that the north line was located as the Indian boundary line; that he himself saw Foster place the stakes at those corners; that in 1888 Emil Rudolph, a surveyor, located a line of stakes about thirty-nine feet south of where the old fence line was, as the Indian boundary line; that shortly before this suit Rudolph again located a line of stakes through there about forty feet south of appellant's north line, showing where streets and alleys would come across this property from the property laid out north of him; that he pulled up the first line of stakes set by Rudolph and threw them over the fence that is now on appellant's north line and where the old fence had been; that he pulled up the stakes located by Rudolph's second survey and took them home with him for kindling; that in August, 1892, August Hamich built a fence about nine feet south of the old Foster stakes at appellant's northeast corner and ran it southwesterly about half way down appellant's north line where the old fence was, cutting a triangular strip off the northeast part of his land, and that he (appellant) pulled out the posts and threw them over on Hamich's property north of the old fence line; that about two weeks afterwards Hamich again put those posts in the same place as before and

that appellant pulled them out and took them home with him, and that Hamich then stopped erecting further fences and did not do anything on appellant's land after that time; that during all those times said surveys were being made and Hamich was attempting to build said fences, and that at the time appellant was erecting his fence, in 1906, some posts of his father's old fence were still standing on his north line, and that Hamich was ordered by him to get off of appellant's premises, after informing him that he was building fences on appellant's land.

Appellant was corroborated by a number of witnesses. Herman H. Bremer testified that he had been a surveyor for twenty-five years and had been surveying properties in Chicago and surrounding country during that time; that he is familiar with appellant's land in the southwest quarter of section 36, and that he surveyed for appellant, June 16, 1914, his said tract of land; that from old notes in his possession he located the southeast and northeast corners of said quarter section; that 2537.5 feet north of the southeast corner he found Foster's four-inch stake just north of the old fence post sunk in the ground for the Indian boundary line on the northeast corner of the survey; that at the northwest corner of appellant's tract he located an old stake five-tenths of a foot west and one-fourth of a foot northwest of the fence post at that corner, which was 420.48 feet north of the southwest corner of the fence around appellant's farm; that from said old stake he ran the line along appellant's present north fence line northeasterly 1551.65 feet and found Foster's four-inch stake for the northeast corner of the survey, and at a distance of 1557.26 feet on the same line he found the intersection of the Indian boundary line by a stake set by Foster with the east line of the said southwest quarter. His testimony showed clearly that appellant's present north fence line is on the reputed Indian boundary line as located by Foster in 1886. Bremer further testified that measuring along the east line of the

southwest quarter appellant's fence is 47.5 feet north of
the theoretical Indian boundary line as established by him-
self, and that the fence is 40.67 feet at that point when
measured at right angles from the Indian boundary line;
that on the west line of the northeast quarter of the south-
west quarter the fence is 45.20 feet north of the theoreti-
cal Indian boundary line and 38.72 feet measured at right
angles; that appellant's strip of property north of the In-
dian boundary line gets narrower as it runs westward, and
that the distance between the east line of the property oc-
cupied by Bugner and the true east line of the southwest
quarter of section 36 is 22.47 feet at Bugner's southeast
corner and at his northeast corner 4.69 feet. The strip east
of appellant's tract last mentioned is in California avenue.

Michael E. Smith testified on behalf of appellant that
he was acquainted with John Bugner in his lifetime and
with appellant; that he had known the land in question as
the Bugner farm since his boyhood and that at the time of
the trial in this case he was fifty-six years old; that during
his boyhood he trapped on the land west of the Bugner
farm and passed over the farm three or four times a week
during the winter months, and sometimes, but not often,
during the summer months, from 1876 to 1896; that he
knows of the old fence on the north line of the Bugner
farm and that it was reputed to be the Indian boundary
line; that there was a ditch along the south side of the
old fence and a bank between the fence and ditch, on which
he traveled, while trapping, to avoid the water; that before
the country was drained by drainage ditches and the land
cultivated, water stood during the winter season most all
over the land on either side of the old fence row; that the
fence and the ditch were known as the Indian boundary
line, and that appellant's present fence is along the same
line as the old fence before it. Smith also testified that
along that fence line ash trees and cottonwood trees grew
up from time to time, some of which were gone by removal

or decay, but that he thought there were some of the ash trees still along that old fence row that were there when the old fence was there, one in particular that he mentioned as near the west end of the fence line.

Appellant was also corroborated by a number of other witnesses, old men who had lived in the immediate neighborhood of that land, to-wit, Bernard F. Webber, Mathias Mann, Nicholas Mann and John H. Fortmann, who testified to the fact that John Bugner had his premises fenced for a number of years while he lived thereon, and that his old north fence line was at that time reputed in that neighborhood to be the Indian boundary line, and they gave it as their judgment that appellant's present north fence line was on the same old fence line, although some of them were not so positive as Smith about the two lines of fence making one and the same line.

Emil Rudolph, a surveyor, was a witness for appellees and testified that he made his first survey of appellant's property in 1887, which survey he made for Hamich, appellant and others; that he spent about a week in that survey trying to locate the Indian boundary line and was unable to make up his mind where it really is; that there had been two different surveys of section 36 by the government,— one north of the Indian boundary line and one at another time south of it,—and that in his opinion the two surveys did not come together as the plats indicated; that he wrote to Washington for instructions to start the division of the section but did not hear from the authorities for a month, and that when he did get an answer he did not know any more than he did before; that in January, 1888, he continued the survey and located the Indian boundary line at the same place he did in a later survey, in 1910, and which he thinks from all the evidence in the records to be the true location of said line, which is some 39.69 feet south of the line claimed by appellant as the north boundary line of his land. Rudolph also testified that he located the old

fence posts running northeast and southwest on what he calls a division line of fields that was at the north line of the Bugner property when he made his survey in 1887 and 1888; that there was a ditch there, a line of posts and a hedge or division of fields; that what he means by the hedge or division of fields was nothing but a narrow strip of old weeds and brush that had grown up and were not cut down; that the land had been plowed on both sides thereof, and thereby made what he called a division of fields. He also testified that he set stakes across appellant's land to mark what he called the Indian boundary line that he made in 1888; that he found one of those old posts north of what was reputed to be the Indian boundary line; that he did not note where he found the post north of the line that he located, but that it was on that same division of fields that he had mentioned and ran in a line northeasterly; that one of these posts was 41 feet north of the line he located as the true Indian boundary line when measured at right angles, that post being at or near the west line of appellant's land. He later states in his testimony: "I would like it understood that the line of posts and the hedge or the division of fields is 39.69 feet north of the Indian boundary line. * * * It would be approximately 30 to 35 feet at right angles with the Indian boundary line. I did not measure. I am approximating that. I measured the distance north and south. I am guessing in my answer as to the distance at right angles." He also stated that he could not tell exactly where the posts at the northeast corner of the Bugner tract are located with reference to the Indian boundary line, but thinks they ran nearer to the Indian boundary line towards the east. He further states, however, that at a point 150 feet, or thereabouts, east of California avenue the weeds and hedge at the eastern line of the Hamich tract marking the boundary line between the cultivated fields was 26 feet at right angles from the boundary line "as we ran it." This last point of measure-

ment was 200 feet or more northeast of appellant's north-east corner.

The testimony of Rudolph shows absolutely, beyond any sort of doubt, that a very large part of the disputed strip, if not all of it, was in the possession of appellant and being cultivated by him at the very time this survey was made in 1887 and 1888. As both owners north and south of this disputed line were at that time cultivating their lands, we cannot understand why they would have a line established in 1886 and then not be guided by it in the use of their lands. There is no evidence in the record that anyone questioned Foster's survey at the time it was made. There is no evidence in the record that there was any attempt to question it until 1892, when the Hamich boys undertook to build fences at the northeast corner of appellant's land for their father. The Hamichs testified that they attempted to build these fences in 1898, and not in 1892. This attempt of the Hamichs to get possession of a part of the northeast corner of appellant's land no doubt came about by reason of the survey made by Rudolph in 1888, as that is the first time, so far as the record shows, that anyone claimed or supposed that the Indian boundary line was not where it was reputed to be in that neighborhood. The evidence does show conclusively that there was what is called a division of fields on appellant's north line at all times from 1882 up to the time of the trial, and everyone who spoke of that division of fields also spoke of the ditch and the little embankment north of it, across which many persons walked to avoid water during the wet seasons. There is not a particle of evidence in the record to the effect that Bugner ever plowed or cultivated across the line of that ridge and ditch or cultivated any portion of the cultivated land on the north side of it. If he had gone across and plowed up any ground already in cultivation there would undoubtedly have been found some witness who would have testified to that specific fact.

The only witnesses who claim to know anything about changes by Bugner of his north line and north line fence are Hubert Irmiter, twenty-two years old when the case was tried in the trial court, Peter Hamich, forty-nine years old, and Edward Hamich, forty-seven years old. Irmiter testified that the present fence on the north line of appellant's land was built in 1905 or 1906, and that the property at that time was planted in cabbage, potatoes and other crops; that at that time the land was only cultivated up to a point 15 or 20 feet south of the present fence, and that there are two ways by which he fixes the location: First, by a stump that is about 20 feet south of the fence; and second, by the fact that that stump was on a line with Bugner's "north line of cabbages," and that the line of cultivation was due west of that stump. He also stated that there was a ditch just deep enough to turn the water off along the north side of the cabbage patch, and that there was no ditch along where the present fence is, and that there never was but one ditch. Later, on cross-examination, he stated that the old ditch north of the cabbage patch was about one-half as deep as the present ditch along the present line of appellant's north fence; that the north ditch could hardly be called a ditch; that the ditch at the cabbage patch was always known as the Indian boundary line, and crossed California avenue about 15 or 20 feet south of the present fence. Peter Hamich testified that in 1897 or 1898 the ditch was 102 or 104 feet south of Pratt avenue at California avenue, and that the eastern end of the ditch was along the Indian boundary line; that there was a stump eight or ten feet south of the ditch on the opposite side of California avenue, and that by this stump and a couple of trees east of California avenue, near which were driven some stakes, he locates the ditch; that the first tree was about two feet east of California avenue, and the other tree was east of that about 20 or 30 feet; that the first tree was 130 feet south of Pratt avenue, and that "the stump of

it is still there." He further stated that the Indian bound-
ary line was about 130 feet south of Pratt avenue, and that
he measured it in 1898, when he attempted to build the
fence that appellant pulled up, and that the present fence
is about 25 feet north of where the ditch was in 1897 or
1898. He further testified that neither his father nor any
of the family ever lived on the property north of the Bug-
ner tract; that his father rented it out as a farm from
1885 to 1904, and that the tenant plowed up as far as that
ditch and raised potatoes, cabbage, corn and peas.

The stipulation of counsel in this case is to the effect
that Barbara Hamich, the mother of the Hamich boys, ob-
tained title to the land north of the Bugners in 1876; that
she died in 1888, and that all of her heirs, including the
two boys, conveyed the land to their father, August Ha-
mich, in 1904. The plat of Sallinger & Hubbard's addition
to Rogers Park, which lies north of the Indian boundary
line and includes the strip of land in dispute in this suit,
shows that the distance from Pratt avenue to what is termed
the true Indian boundary line is 143.25 feet, measured on
a straight west line north of California avenue, which is
also the east line of the Bugner land. It is difficult for us
to understand Peter Hamich's testimony, but it seems cer-
tain that his testimony does not correspond with the testi-
mony given by Hubert Irmiter or any other witness. The
ditch he located was about 14 feet north of the true Indian
boundary line according to the last part of his testimony
and more than 39 feet north of it according to his first
statement. The testimony of Edward Hamich in the main
corroborates the testimony of appellant. While he testifies
that he and his brother attempted to build the fences in
1898, he states that the Bugners and Hamichs were using
their lands at that time for farming purposes; that he could
not say where the cultivation by Bugner was; that the ditch
was on the south line of the Hamich property at that time;

that the only time he ever saw the property north of the Bugner land cultivated was when Mrs. Delare had it as a tenant of his father, between 1899 and 1904; that Bugner at that time cultivated up to within about four feet of the ditch on the south side, which was in the same place as the ditch in 1898, and that Mrs. Delare cultivated up to the ditch on the north side; that there was no fence at that time; that the ditch was possibly two feet wide and ran in a straight line; that there was shrubbery and grass on the ditch; that that ditch was the only ditch along there between the two properties, and that there were no low, irregular depressions in the soil near the ditch. He then makes a statement somewhat inconsistent with his other testimony, to the effect that the present fence is 25 or 30 feet north of the ditch that was there when he was building the fence in 1898. He does not pretend to know where the lines were, but states that his father showed him where the line was.

The only other evidence apparently relied on by appellees is the testimony of Frank H. Nelson, a surveyor who surveyed the addition. He simply stated that he located the stump of an old tree that had been cut down on the east side of California avenue and south of Pratt avenue, and southeast of the true Indian boundary line at right angles nine feet and nine inches. This stump was not shown to be a stump to which any other witness referred, and no argument is made to show that it has any relation to any facts relied upon to establish any of the lines in controversy in this case. There was also some impeaching testimony by two witnesses whose testimony showed, in substance, that appellees had cut down all the large trees along the present fence line spoken of in the testimony of appellant and of Smith, and that the cross-sections taken from those trees within less than a foot of the ground showed that the oldest of the trees was not more than fourteen years old. We attach no very great importance to this evidence although

we concede the truth of it. The evidence shows that trees have been removed and transplanted from said fence line, that others have decayed and fallen away, and that still others had been cut down long prior to the trial. The witnesses were not very positive that any of the trees remained to which they referred as growing upon the fence line in 1882. They did give it as their judgment that some of them were then growing there. They were evidently mistaken. Appellant's testimony is in every other respect strongly corroborated in much the greater part thereof by the most important witnesses for appellees, and his claim must prevail. The reasons given by the two Hamichs and Irmiter to support their claim that appellant's fence line had been moved further north from 15 to 25 feet and a new ditch and a new bank made along the south side of the new fence are most unsatisfactory. Their testimony is contradictory within itself and each contradicts the other in very important matters. The only thing they do agree on is that the fence was actually moved north from 20 to 25 feet.

The evidence shows, beyond all reasonable doubt, that from 1863 to 1880 John Bugner was in possession of the entire land described in appellant's amended bill, including about all, if not all, the disputed strip, and that he used it simply for the purpose of cutting wild hay or grass therefrom up to his old fence line on the north side, and that he had it under fence during all of that time; that after he made his deed he surrendered or abandoned possession to appellant of all the premises he had under fence in the year 1881 pursuant to his deed made in 1880; that appellant continued in the possession of the tract his father delivered to him and cut wild hay off of it on the north side and up to said north fence line up to 1887, and also cultivated some portions of the land on the south part during that time; that from 1887 up to the time the decree was rendered in this case appellant has been in possession of

all of the land described in his bill, and that the north line of his possession was marked by a line surveyed by Foster in 1886; that since 1887 he has farmed it, plowed it and cultivated it up to within two or three feet of the Foster line; that he has raised crops thereon every year and has built a house on the farm during that time; that his north boundary was at all times marked since 1887 by the ditch and bank referred to by some of the witnesses as a division of fields; and that his possession has been peaceable, exclusive, continuous, uninterrupted, notorious, hostile and adverse.

It is argued by appellees that appellant, under the law, could not tack his possession onto that of his father as to the disputed strip, because the evidence does not show a delivery of the possession of that strip by John Bugner to appellant. The evidence clearly shows a delivery, or at least an abandonment, of the possession by the father and a taking possession thereof by the son in 1881. Both appellant and his father at that time supposed that the deed of the father described all the land that he had fenced and that the north line thereof was the Indian boundary line. But be that as it may, the evidence shows, beyond all reasonable doubt, that appellant has had possession of all the land claimed by his bill since 1887, and that his claim of title has not only been against appellees but against his father and all the world. So in order to make out his title he does not have to tack the possession of his father onto that of his own to make good his title.

It is also contended by appellees that the Hamich boys broke the continuity of appellant's possession in 1892 or 1898 by entering on part of the land and fencing it. Their entry was unlawful and they were simply trespassers at that time upon the possession of appellant. The lower court was no doubt led into an error in finding that the continuity of appellant's possession was thus broken, for the determi-

nation of this question necessarily settles the right of appellant to recover in this case.   Appellant was in the actual possession of the land at the time the Hamich boys entered his land for the purpose of fencing part of it and taking possession thereof, although it was not fenced.   It is not necessary that land should be enclosed with a fence or that a house should be erected upon it to constitute possession or that it should be reduced to cultivation.   Such improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who has the exclusive control and management of the land will be deemed sufficient to constitute possession.   (*McLean* v. *Farden,* 61 Ill. 106; *Eddy* v. *Gage,* 147 id. 162.)   Everybody in appellant's neighborhood was fully apprised of his possession of the disputed strip by his cultivating it up to the ditch for more than twenty-seven years prior to the bringing of this suit.   His act of cultivation apprised everyone who witnessed it that he actually cultivated the whole strip during that length of time to within about two or three feet of the north line, and the "division of fields" on his north line clearly marked the line to which he claimed, as completely as if a fence had been at all times erected thereon.   The owners north of him recognized his possession and his claim and only occupied and cultivated the land north up to the division of fields on the north side of the embankment.   Another important fact which points to the conclusion we have reached is that John Bugner's land was the only land fenced for miles around it, up to the time appellant took possession of the land, so there was no opportunity for any surveyor to find any other old fence line at or near the disputed boundary.   If each grantee succeeds to the possession of his grantor there is such privity between the occupants that their several possessions are referred to and regarded as continuous.   (*Rich* v. *Naffziger,* 255 Ill. 98; *Shedd* v. *Alexander,* 270 id. 117; *Kepley* v. *Scully,* 185 id. 52.)   The continuity of appellant's posses-

sion was unbroken. The entry of the Hamichs in 1892 or 1898 was not a peaceable entry but an unlawful entry by force. To constitute forcible entry and detainer under our statute it is not essential that the entry be made with strong hands or be accompanied with acts of actual force or violence either against person or property. If one enters into the possession of another against the will of the one whose possession is invaded, however quietly he may do so, the entry is forcible in legal contemplation. (*Phelps* v. *Randolph,* 147 Ill. 335; *Reeder* v. *Purdy,* 41 id. 279.) The Hamichs could not legally obtain possession by such unlawful acts, and the continuity of appellant's possession could not be broken in a way not recognized by law. Appellant had a right to maintain an action of trespass against them although the Hamichs might have been such owners as could have maintained an action of ejectment against him at that time. *Fort Dearborn Lodge* v. *Klein,* 115 Ill. 177.

The evidence in this case clearly and positively shows that none of the appellees have ever had possession of any part of the disputed strip,—such possession as the law recognizes,—since 1887, but that the appellant has been in the actual possession thereof at all times since that time under claim of ownership against the whole world that has ripened into an absolute title in fee simple, and that he is entitled to the relief prayed in his amended bill, to quiet title and to remove cloud, etc.

The decree of the superior court is therefore reversed and the cause is remanded, with directions to enter a decree in favor of appellant and against appellees according to the prayer of his bill.

*Reversed and remanded, with directions.*