The Bellefontaine Improvement Company *et al.*

*v.*

F. G. Niedringhaus *et al.*

*Opinion filed October 16, 1899.*

1. Adverse possession—*title to accretions may be acquired by possession of adjoining land.* Accretions to land held under the twenty years' limitation law, or by claim and color of title and payment of taxes, go with the land to which they are attached.

2. Same—*possession of part of tract includes all land described in color of title.* Possession of part of a tract of land under color of title to the whole tract is possession of the whole tract described in the deed under which title is claimed.

3. Accretions—*bar connecting with island is an accretion to latter.* A bar which so forms in a river as to connect with an island is an accretion to it, although the land connecting them is sometimes submerged.

4. Riparian rights—*title of riparian owner extends to the middle of main channel.* The title of a proprietor on a river extends to the thread of the main channel, and his boundary changes with the variation of the center of the river's main channel.

5. Boundaries—*boundary between States bordering on river is at the center of permanent channel.* The boundary between States separated by a river is the center thread of the permanent stream, and not of that part which flows during high water and is dry at other times.

6. Same—*riparian boundaries follow gradual changes in main channel of a stream.* Boundaries formed between proprietors or States by the center thread of a river conform to gradual and insensible changes in the channel of the stream, but where a considerable tract, which can still be identified, is by the violence of the stream joined to another tract, the property of the soil continues vested in its former owner.

7. Same—*local boundary between Illinois and Missouri is west of Willow Bar Island.* The local boundary line between the States of Illinois and Missouri, as well as the boundaries of Illinois proprietors, is the present center thread of the stream between Willow Bar Island and the Missouri bank.

8. Evidence—*declarations of grantor disclaiming accretion are inadmissible against grantee.* Declarations made by former owners of land disclaiming ownership of an accretion to it are not admissible to prejudice the title of their grantee.

Appeal from the Circuit Court of Madison county; the Hon. William Hartzell, Judge, presiding.

JULIAN LAUGHLIN, E. C. SPRINGER, and J. G. IRWIN, for appellants.

TRAVOUS & WARNOCK, for appellees.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

Appellees filed a bill for partition of and to remove a cloud from certain lands situated in township 3, north, range 10, west of the third principal meridian, in Madison county, Illinois. The land is bounded on the south by the north line of the south half of section 23, and the western continuation thereof to the main channel of the Mississippi river; on the north by land of the Granite City, Madison and Venice Water Company; on the east by a channel of the Mississippi river known as "Gaboret slough;" and on the west by the thread of the stream in the main channel of the Mississippi river. The bill alleges that the complainants and the defendant the St. Louis Stamping Company are the owners of the land in equal portions, as tenants in common, by title derived through a regular chain of conveyances from the government, and by open, continuous and adverse possession of the same, by them and their respective grantors, for upwards of twenty years, and by possession under claim and color of title made in good faith, with seven years' payment of taxes, as required by the statute. Appellants and about one hundred and fifty other persons were made defendants. The object and purpose of the bill are for partition of a tract of land known as "Gaboret Island," and what are claimed and known as lands and accretions thereto.

Appellant the Bellefontaine Improvement Company, a corporation of the State of Missouri, answered the bill, claiming ownership of a part of the lands sought to be partitioned, known as "Willow Bar Island," and which is by it claimed to be situated in township 46, north, range 7, east of the fifth principal meridian of Missouri;

that it is bounded on the east by the old main channel of the Mississippi river and on the west by a new channel, known as "Sawyer's Bend;" that it also owns the bar lying immediately south of and until recently a part of the first mentioned tract; that the improvement company claims the island and bar are in the State of Missouri and constitute a part of that State, and claims its title is a Missouri title, derived by regular chain of conveyances from the Spanish government. Appellant Turner also answered the bill, claiming title to fractional section 3, sections 10 and 11, and all of fractional sections 14 and 15 lying north of a line running east and west, parallel to and 5.28 chains south of the south line of said sections 10 and 11, in the State of Illinois.

There were numerous disclaimers filed and numerous defaults entered. A decree was entered in accordance with the prayer of the bill, and the defendants, the Bellefontaine Improvement Company and J. B. Turner, prosecute an appeal to this court.

The determination of the controversy between the Bellefontaine Improvement Company and appellees depends on whether the island and bar are in the State of Illinois or in the State of Missouri,—or, in other words, where the thread of the stream of the main channel is with reference to the lands in controversy. As a part of the controversy it is necessary to determine whether Willow bar became and was a part of lands attached to the Missouri shore and constituted a part of the Missouri lands at any time, and whether it was separated therefrom by avulsion. The question in dispute between Turner and appellees is based on the claim of the former to title by reason of certain conveyances and an alleged judgment in ejectment on January 30, 1874, and is a controversy depending on the title of the respective parties.

It was admitted by both appellants in open court, on the hearing, that on the 28th day of January, 1896, immediately preceding the commencement of this suit, the

complainants and the defendant the St. Louis Stamping Company had title to all the real estate involved in this suit by the deeds introduced in evidence as color of title, with seven years' continuous possession under claim of title and payment of taxes successively for said period, and by continuous adverse possession for a period of twenty years immediately preceding said January 28, 1896, except fractional section 3 of lot 3 of the Woolridge subdivision, known as the "Beckman tract," and accretions thereto, and the island known as "Willow Bar Island," and the lands lying west of the west high bank of Gaboret Island.

The appellant Turner claims that Gaboret Island, with the exception of fractional section 2, was patented to William Rector. Rector conveyed the north half, to-wit, fractional sections 3, 10 and 11 and the north parts of 14 and 15, to William O'Hara in 1820. Helen O'Hara Harrel, as sole heir-at-law of William O'Hara, conveyed the same, along with other property, to one Kibbe in 1868. Kibbe recovered a judgment in 1874 against Beckman for possession of fractional sections 3, 10 and 11 and the north part of 14 and 15. Kibbe conveyed the same property, in 1877, to the appellant Turner. Appellees' title to section 3 (which is claimed by Turner) is based upon a tax deed made in 1843, while their title to section 2 originates from the government. The two sections were united in October, 1857, in the conveyance from Hawkins *et al.* to Hopkins, and passed by *mesne* conveyances to complainants below and the St. Louis Stamping Company, each deed describing both tracts. The two fractional sections adjoin, and were used and occupied by appellees and their grantors as one farm. They were so enclosed and used by the Fishers under proper deed and claim of ownership continuously for nearly thirty years.

It is shown that fractional section 2 was conveyed to appellees by *mesne* conveyances from John Stein, who was the patentee thereof. Fractional section 3 was con-

veyed to appellees by *mesne* conveyances from Thomas F. Purcell, who acquired the same by a tax deed from the Auditor of State, of date August 12, 1846. Subsequently the appellees, seeking to further protect their title, offered in evidence a deed of date September 17, 1880, from Frederick Beckman and wife to John Schenk, conveying lot 3. Schenk conveyed to his wife, by will, all his real estate, and June 4, 1887, she conveyed to Peter Schenk, and Peter Schenk and wife conveyed to the St. Louis Stamping Company on May 22, 1891. These latter mentioned conveyances show color of title in the St. Louis Stamping Company, who, with appellees, claim to own the land in controversy a partition of which is sought.

With these conveyances the evidence shows that appellees and the St. Louis Stamping Company paid taxes on fractional sections 2 and 3 from 1885 to 1891, inclusive. This is, as to these lots, color and claim of title and payment of taxes for seven successive years. Fractional sections 2 and 3 having been used continuously under proper deeds and claim of ownership for nearly thirty years as one farm by parties in privity with the title of appellees, appellees, with their grantors, were in adverse possession of fractional sections 2 and 3 for more than twenty years. This possession was with claim of ownership.

Appellants contend that a claim of title by accretion cannot be sustained where the accretion is to land held by claim and color of title and payment of taxes, or to lands held under twenty years' limitation. When adverse possession has ripened into a title, that title relates back to the inception of the possession. It is not necessary that a party should have lands enclosed before he can be said to be in actual possession. It was said in *Fisher* v. *Bennehoff*, 121 Ill. 426 (on p. 439): "When he has color of title, possession may be shown by the constant and uninterrupted use through a series of years; and of timber land, by taking therefrom wood for fuel, fences and other purposes; or it may be shown by an actual occupancy of

a portion of a tract for which he may have a deed, under which possession is held. In such cases the deed may be regarded as enlarging the possession to all the land it includes." It was held in *Dills* v. *Hubbard*, 21 Ill. 328: "If he makes entry under a conveyance of several adjoining tracts, his actual occupancy of a part, with a claim of title to the whole, will inure as an adverse possession of the entire tract. Possession is to be regarded as coextensive with the description in the deeds under which he enters, and the original entry as a disseizin of the owner to the same extent." It was held in *Saulet* v. *Shephard*, 71 U. S. 502: "Where one has been in the uninterrupted and peaceable possession, for more than twenty years, of the property or real estate to which the accretions sued for are attached, as long as they existed he owns such accretions."

In *Benne* v. *Miller*, 50 S. W. Rep. 824, decided by the Supreme Court of Missouri March 31, 1899, in speaking of the character of possession necessary to constitute adverse possession, the court say, quoting from *Ewing* v. *Burnett*, 11 Pet. 53: "To constitute adverse possession there need not be a fence, building or other improvement, and it suffices for that purpose that visible and notorious acts of ownership are exercised over the premises in controversy for the time limited by the statute; that much depends upon the nature and situation of the property, the uses to which it is applied and to which the owner or claimant may choose to apply it; that it is difficult to lay down any precise rule in all cases, but that it may be safely said that where acts of ownership have been done upon land, which, from their nature, indicate a notorious claim of property in it, and are continued sufficiently long with the knowledge of the adverse claimant, without interruption or an adverse entry by him, such acts are evidence of the ouster of the former owner and an actual adverse possession, provided the jury shall think that the property was not susceptible of a more

strict or definite possession than had been so taken and held; that neither actual occupancy, cultivation or residence are necessary where the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership such as he would exercise over property which he claimed in his own right and would not exercise over property which he did not claim."

In speaking of possession as applied to accretions the court said: "An accretion becomes a part of the land to which it is built, and follows whatever title covers the main land, whether it be title by deed or title by possession. In its nature it is not susceptible, during its forming, of that kind of possession which distinguishes the occupation of dry land. But it attached to the dry land even while it is under water, and belongs to the owner of the land, and is in the actual possession of him who holds the actual possession of the main land. If the main land is in fact unoccupied, it is in the constructive possession of the owner of the true title, and that gives constructive possession of the forming accretion. But if the main land is held in adverse possession to the true owner, he is not in constructive possession of the accretion; and since the accretion, in its formative state, is not susceptible of actual occupancy in the sense of a *pedis possessio,* the indicia of the actual possession of him who held on the main land are extended over the forming accretion and bring it within his actual possession. And it is not necessary that such possession of the accretion should be held for ten years to give a possessory title, because title to it follows title to the main land; and when the latter is held under the conditions and for the length of time required by law to vest the title in the possessor, the title to the accretion follows, even though the deposit had been made but a year or a day. One who acquires title to the main land by ten years' adverse possession acquires title to cover deposits made and making

on his front and during the period in which his possessory title was forming. The accretion grows into the land, and grows into the title of him who holds the land as the title itself grows, and when the title to the main land has become perfect it extends over the accretion, however recent its formation."

Under these authorities it is clear that a title by possession, merely, is sufficient to maintain title to accretions to land the title of which is so held by possession. Where one acquires title by reason of color of title and payment of taxes, accretions to land to which the title is thus held go with the land to which it is such an accretion, to the same extent as to a title obtained directly from one holding the patent title.

The evidence showing that as to fractional sections 2 and 3 there was color of title and payment of taxes, with open, notorious, exclusive, hostile and adverse possession on the part of appellees, their title was sufficient to authorize the decree as to these tracts. Further than that, the title to fractional section 2 is shown to be in appellees by transfers from the patentee of the same, and that it, with fractional section 3, was for a period of about thirty years a part of one farm, and together were conveyed by deed by various grantors who were in privity with the title of appellees, and there being such actual, open, notorious and adverse possession for the period of more than twenty years, with claim of title, that possession and claim of title were sufficient, and would draw to the possession all the lands described in the deed, and this would authorize the decree as entered as to these two tracts. It was held in *Zirngibl* v. *Calumet Dock Co.* 157 Ill. 430: "It is, of course, settled law that possession of part of a tract of land under color of title to the whole tract is possession of the whole tract described in the deed."

Gaboret Island, lying in the Mississippi river on the Illinois side thereof, has been in existence as an island

since the river was known, so far as the evidence in this record shows, and was surveyed and platted by the United States government as a part of Illinois. Opposite Gaboret Island, in the State of Missouri, a tract of land was granted to Hyacinth St. Cyr before the purchase of the Louisiana territory by the United States government, and the tract so granted to St. Cyr was confirmed as United States survey No. 3, and through *mesne* conveyances the Bellefontaine Improvement Company claims title to that tract. Gaboret Island was patented to William Rector by the United States, and through *mesne* conveyances from him, and through color of title, payment of taxes and by possession and limitation, the greater portion thereof became the property of appellees and the St. Louis Stamping Company. By the enabling act of April, 1818, under which Illinois was organized as a State and admitted to the Union, the middle of the Mississippi river was made its western boundary. By the enabling act of March 16, 1820, under which Missouri was organized as a State and admitted to the Union, the middle of the main channel of the Mississippi river was made its eastern boundary. An island was formed in the Mississippi river between Gaboret Island and the western bank of the Mississippi river, which appellees claim is in the State of Illinois and appellants insist is in the State of Missouri. This island is known as "Willow Bar Island." Taking into consideration the manner of its formation and its extent, it is clear that it is an island in the Mississippi river, and its ownership is to be determined by the determination of the question whether it is an accretion to lands on the Missouri side or to Gaboret Island.

As to the formation of the island, it is shown that between Gaboret Island and the Missouri shore there were fluctuations in the channel which rendered the navigation of the river difficult. The weight of evidence, however, shows that the navigable channel was on the western side of the river prior to the formation of this

island, as it has been a greater part of the time since. The evidence with reference to the time when it first was formed is conflicting. The appellants claim that the island was formed by reason of the sinking of certain boats, the first of which sank about 1853. The evidence is, in substance, as follows: William Marcum, who moved with his parents upon Gaboret Island in 1844, testified that he saw Willow Bar Island there as early as 1847, and that he saw the boat "Altona" sink on the west side of the bar in 1856, in what was then the main channel. Captain Seeborn Miller, an old pilot who knew the river intimately in 1847, swears that Willow bar was there at that time and that the main channel was always west of it. Captain Parker, an old pilot whose recollection of the river extended back to 1850, swore that Willow bar was there then, having trees upon it. His brother, Captain Thomas Parker, who knew the river since the early forties, testified that Willow bar formed before the sinking of the boats, and that the main channel was always west of it. Henry Cremer, a resident and former land owner on Gaboret Island, knew Willow bar since 1854, and had on different occasions seen the water in Pocket chute so low that Gaboret Island proper and the bar were practically connected, and states that the channel was always on the west side. Henry Kueter, another old pilot whose knowledge of the river dates from 1854, says the channel was always west of Willow bar. Buttron, who testified for the appellants, swore the island formed in the middle of the river, leaving a channel on both sides. Marsh, a witness for appellants, said he did not know what caused the bar, but that to his knowledge the channel had been west of it for upwards of twenty years. Appellants' witness Montgomery, who knew the river intimately from 1852, swore that they always ran west of the bar, and that it formed east of the main channel in which the boats sank. Monroe, a witness for appellants, and who was upon Willow Bar Island as early

as 1858, a year before one of the boats (the "Baltimore") sank, says there were then trees from four to six inches in diameter upon it. The testimony of Pepper, Leverett, Schenk, Pitzman, Roberts, Hirt and other witnesses shows that the channel was always to the west of the island as far back as any of them could remember. There is testimony in the record showing that between 1878 and and 1883, (the time not being fixed with certainty,) for a period of about two years consecutively, the channel was on the east side of Willow bar.

The evidence with reference to the wrecks of the boats is, that the "Cornelia" sank in 1853, near the Missouri shore, and the "Altona" two or three years after, five or six hundred yards east of the Missouri shore; that the "Baltimore," the largest boat, sank in 1859, about two hundred feet west of the "Altona;" that the "Badger State" sank on top of the "Altona;" that the "M. M. Runyan" struck on the "Baltimore" and sank below her; that the "Keithsburg" sank in the same neighborhood. All of these boats sank in the winter, when the water is generally lowest and when the boats must follow the main channel most closely. Not only did these boats all sink as stated, but some of the wrecks are still west of the Willow Bar Island, the largest (the "Baltimore") being at the extreme western side, and visible only when the water is so low as to be only two or three feet above zero on the St. Louis gauge.

Willow Bar Island at present is separated by the main deep-water channel from the Missouri shore, while only a shallow stretch of water separates it from the Illinois shore. A number of witnesses have testified to occasions when it was so connected with Gaboret Island proper that persons could walk from one side to the other. Being so connected that there was land, sometimes free of water and sometimes submerged, actually connecting it with Gaboret Island, constituted it an accretion to the latter.

It has been the uniform rule of this court that the title of Illinois proprietors to land on a river extends to the thread of the current or main channel. (*Middleton* v. *Pritchard,* 3 Scam. 510; *Trustees of Commons* v. *McClure,* 167 Ill. 23; *Buttenuth* v. *St. Louis Bridge Co.* 123 id. 535; *Fuller* v. *Shedd,* 161 id. 462; *Griffin* v. *Kirk,* 47 Ill. App. 258; *Griffin* v. *Johnson,* 161 Ill. 377.) And his boundary changes with the changes of the center of the river's main channel. (*Houck* v. *Yates,* 82 Ill. 179; *Nebraska* v. *Iowa,* 143 U. S. 359.) In *Nebraska* v. *Iowa, supra,* it was held: "Frequently where, above the loose sub-stratum of sand, there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the sub-stratum of soil into the river, so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible. Notwithstanding this, two things must always be borne in mind, familiar to all dwellers on the banks of the Missouri river and disclosed by the testimony: that while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water. * * * The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from one side and deposit of the same upon the other. The one thing which distinguishes this river from the other streams in the matter of accretion is in the rapidity of the change caused by the velocity of the current, and this, in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect thereto." The court sums up the controversy in this language: "Our conclusions are, that, notwithstanding the rapidity of the changes in

the course of the channel and the washing from the one side and onto the other, the law of accretion controls on the Missouri river as elsewhere, and that not only in respect to the rights of individual land owners, but also in respect to the boundary lines between the States."

On the same character of question this court held in *Buttenuth* v. *St. Louis Bridge Co. supra* (p. 552): "Commercial considerations make it imperative, where States or nations are divided by a navigable river, each should hold to the center thread of the main channel or current along which vessels in the carrying trade pass. That is the 'channel of commerce'—not the shallow water of the stream which at some seasons of the year may be impossible of navigation,—upon which each nation or State demands the right to move its products without any interference from the State or nation occupying the opposite shore." The court also said in that case: "Where a river is a boundary between States, as is the Mississippi between Illinois and Missouri, it is the main—the permanent—river which constitutes the boundary, and not that part which flows in seasons of high water and is dry at other times."

Under the rule announced in these cases it is clear that the boundary line between Illinois and Missouri is, and by the weight of evidence has always been, west of Willow Bar Island, as the thread of the stream is west of that island. Willow Bar Islands are about two miles long, and if any other rule were adopted than that here declared, then the boundary between the State of Missouri and the State of Illinois would, for a distance of two or three miles, not be the thread of the stream, as the thread of the stream would be wholly in the State of Missouri. It is true that in the uncommon case of avulsion, where a considerable tract of land is by the violence of the stream and in consequence of its cutting a new channel separated from one tract of land and joined to another, but in such manner that it can still be identified,

the property of the soil so removed or the tract so cut off by the change continues vested in its former owner; but where the change is gradual, so that it cannot be determined what land has been taken off by the violence of the stream or when its taking away took place, in such case a gradual change of the stream causes the center thread of the stream not only to constitute the boundary of the proprietor's land on that stream to the center thread, but constitutes the boundary of the State. It cannot be said that this record contains any satisfactory evidence of any such sudden change of the thread of the stream as would amount to an avulsion. The change, where any change was made, was gradual and insensible. Neither is there any evidence showing that Willow Bar Island itself was, as a tract of land, cut off from the Missouri shore, but the evidence shows the gradual formation of an island in the stream, and the law of accretions is applicable thereto.

We hold, therefore, the boundary line between the States of Illinois and Missouri, as well as the boundaries of Illinois proprietors, is the present center thread of the stream between Willow Bar Island and the Missouri bank.

Neither are the rule announced in the foregoing cases and the principles herein announced in conflict with the adjudications of the Supreme Court of the State of Missouri. It has been held by the Supreme Court of that State, that where the owner of land in Missouri bordering on the Mississippi river loses a portion of the same by its being submerged or washed away, and a tow-head forms in the river between his land and an island opposite thereto, and land gradually accrues to the tow-head and extends towards his land and within the limits of his original survey, it is nevertheless not an accretion to his land and he has no right thereto. (*Cox* v. *Arnold*, 129 Mo. 337.) To the same effect is *Cooley* v. *Golden*, 117 Mo. 33.

It is insisted by the appellants that the court erred in excluding evidence offered by them, by which they

sought to prove that certain owners of lands on the west side of Gaboret Island, opposite Willow Bar Island, did not claim that Willow Bar Island was a part of Gaboret Island. There was no error in excluding this testimony. Owners of land or of any interest therein could not, by any declarations made by them, prejudice the title of their grantee. Neither would their declarations be binding on the appellees, who acquired title through them, for the reason that an accretion to the land purchased from them is determinable solely by reference to the fact of accretion to those lands, and not by an assertion of a claim of ownership. It was not error to exclude that evidence.

From a careful examination of the record we find no error in the decree, and it is affirmed.

*Decree affirmed.*