(No. 21057.—

GORDON Z. DAVIS *et al.* Appellants, *vs.* AARON HAINES *et al.*
Appellees.

*Opinion filed October 22, 1932.*

SUMNER & REARDON, for appellants.

C. C. WORTHY, and GEORGE C. WEAVER, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellants seek review of a decree of the circuit court of Calhoun county denying the prayers of their bill which seek to remove certain deeds as clouds on their title and to enjoin the appellees (defendants) from trespassing upon the property involved or interfering with the use thereof by the appellants. The cause was referred to a master, who heard the evidence and reported the same to the court, and on hearing the chancellor sustained certain allegations of fact upon which appellants' contentions are based but denied the relief sought in the bill.

The land involved in the suit consists of a "tow-head" in the Mississippi river. The appellants by their bill claim title to the tow-head by adverse possession and through riparian rights, alleging that the tow-head is an accretion to an island owned by them, known as Turner Island or Island No. 55. Appellees contend that the tow-head is not an accretion to Island No. 55 and that appellants have no rights therein. The right to the tow-head presents the question in this case.

In 1848 one Aaron Haines entered Island No. 55 through a patent from the United States. This island at that time was surveyed and sold by the United States by a separate

patent as "being a part of section 1 in township 12 south of range 3 west, in the district of lands subject to sale at Quincy, Illinois, containing 56.53 acres." At the same time Haines received a patent for the west half of the southeast quarter of section 36 in township 11 south, range 3 west, being a portion of the mainland lying east of the Mississippi river, in Calhoun county. The western boundary of that land is the Mississippi river. The original Island No. 55 lay in the northern part of section 1 of township 12 and south of the south line of section 36 of township 11. The island and this mainland tract were later acquired by one Levy H. Turner. In May, 1883, Turner conveyed Island No. 55 to Alanson J. Fuller and William H. Fuller. This conveyance was by the description in the patent. By the record it appears that at the time of the Fullers' purchase the island had increased in size until it extended more than a quarter of a mile north across the south line of section 36 and contained about 160 acres. In December of that year Turner conveyed the mainland tract in section 36, township 11, to one Frederick Gueck. The Fullers held Island No. 55 until 1908, when they conveyed it as containing 160 acres, more or less, to the Grafton Stave and Heading Company. In 1913 this company conveyed the island as containing 160 acres, more or less, to the appellants, who have been in possession since that time. In 1926, and since, certain persons claiming to own the west half of the southeast quarter of section 36, township 11, executed quit-claim deeds to appellees. These deeds purport to convey "a certain island in the Mississippi river, being a detached part of the southwest quarter of section 36, township 11 south, range 3 west 4th P. M., lying up the river from and next to what is commonly known as Turner Island." Appellees' claim to the tow-head is based on these quit-claim deeds.

There is nothing in the record to show that the southwest quarter of section 36, township 11, was ever surveyed,

platted or patented, but appellees claim that the so-called southwest quarter lies between the shore boundary of the west half of the southeast quarter of that section and the middle thread of the Mississippi river, and that as their predecessors in title owned the portion of the southeast quarter referred to, the tow-head belonged to them by their deeds given them under the riparian rights of the owners of the west half of the southeast quarter.

In 1887 the United States government built a dike across the east channel of the river between the island and the mainland. This dike is all in section 36, and extends in a southwesterly direction from the mainland and connects with Island No. 55 about a quarter of a mile south of the north end thereof. The tow-head which has been formed lies to the north of the dividing line between sections 1 and 36 and east from the north end of Island No. 55. The chancellor found that appellants had acquired title by adverse possession to the portion of the island extending into section 36, and appellees have assigned no cross-errors on that finding. The evidence fairly shows that at the time the Fullers purchased the island, in 1883, it extended north into section 36 approximately the same distance as at the time of the hearing. The chancellor found, however, that appellants had not acquired title to the tow-head. Appellants claim that they acquired title thereto not only by adverse possession but also under their riparian rights, as owners of the island, to accretions.

The evidence is undisputed that the tow-head is, and for many years has been, connected with the island, and that at moderately low water in the Mississippi river the connection with the island is dry land. At the time of the hearing it was so connected all along the east part of the north end of the island, with the exception of a pool of water toward the south end of the tow-head. The evidence shows that the tow-head is an accretion to Island No. 55. The fact that it at times of high water is separated from the

island does not deprive it of such character. (*Bellefontaine Co.* v. *Niedringhaus,* 181 Ill. 426.) Alanson J. Fuller testified that when he and his brother purchased the island, the tow-head, which now contains about eleven acres, had an area of about three acres; that at times one could walk across from the island to the tow-head on dry land; that they kept their stock on the island, and the stock pastured on the tow-head as much as on the island. He testified that they used the tow-head for pasturage and for cutting of willows used as binder poles to bind together, for shipping, the logs cut from the main portion of the island. He testified that they stopped others from cutting such poles and at one time secured a warrant for parties who were attempting to do such cutting. One William Parker, an employee of the Grafton Stave and Heading Company during the time it owned Island No. 55, testified that he had known the island since 1901 and had been in charge of it and caring for it for seventeen years; that he lived on it with his family for thirteen years, commencing in 1913; that during the time the stave company owned the island he cut willows on the tow-head and sold them, and that employees of the company cut binders off the tow-head for logs and took them across from the tow-head to the island in log wagons. He testified that he knew that the Fullers pastured their stock on the island and tow-head, and that since appellants had purchased the property about six acres on the tow-head had been cleared and put in crops, first crop being in 1915. He also testified that in 1926 he had a conversation with certain of the appellees, at which time he told them that the tow-head belonged to the appellants; that before that time certain of appellees and others asked permission of him to come onto the tow-head to shoot during the duck-hunting season, and that in 1928, under the direction of appellants, he ordered certain of the appellees off the tow-head. Appellees argue as against this testimony that eight of their witnesses testified that in 1887

they worked on the government dike that was being built across the east branch of the river and that the tow-head was not in existence at that time but where it later formed there was then nothing but water. An examination of the abstract of the testimony of those eight witnesses discloses substantial disagreement among them as to the existence of the tow-head in 1887. The record also shows that during the building of the dike the water was at a high stage, and that at times in high stages of water not only the tow-head but the island was inundated. Of appellees' witnesses, John Klockenkemper testified that at the time the dike was built there was a little bar east of the island, which grew some while he was there. William Eilerman testified that at the time the dike was built there was a small bar north of the island—about four or five acres. Hollis Wineland so stated in his testimony. Charles Finney testified that at the time the dike was built a little tow-head was forming at the north end of the island and that there was some timber or willows on it. Others of these witnesses testified to having some recollection of the existence of a small island or tow-head there. Others testified that they could not say there was any bar at the head of the island at the time they were working there, while some testified that no bars existed there at that time.

In view of this disagreement among appellees' witnesses and the fact that the dike was built more than forty years prior to the hearing in this cause we cannot say that the testimony of those witnesses tends to establish that there was no tow-head at the time the dike was built or to rebut the positive testimony of appellants' witnesses. A map of government survey made in 1878 was introduced in evidence and shows the existence of bars east and northeast of Turner Island as it then existed.

It is further argued that even though Fuller's testimony as to his possession be believed the evidence is not sufficient to show title by adverse possession, and counsel cite the

rule that an adverse claimant must prove by evidence clear and positive the facts upon which he bases his title by limitation and that no presumption is to be indulged in his favor. Such is the rule in this State. (*Yunkes* v. *Webb,* 339 Ill. 22.) They argue that pasturing and cutting timber are not sufficient to show adverse possession as against the true owner, and they cite in support of this contention, *Travers* v. *McElvain,* 181 Ill. 382, and *Harms* v. *Kransz,* 167 id. 421. In the former of these cases this court held that cutting timber on one or two occasions on unfenced and unimproved wild land is not alone sufficient evidence of ownership to amount to possession adverse to the owner. In the *Harms case* the cutting of firewood upon land was depended upon as evidence of adverse possession and was held insufficient. Those cases do not control in a case such as this. It is impossible to specify the particular acts which under every condition constitute adverse possession of land. Much must depend upon the uses to which the land may be put. To be adverse the possession is not required to be more full than the character of the land admits. What acts constitute adverse possession are necessarily varied, depending upon the nature, locality and use to which the property may be applied. A variety of circumstances must be taken into consideration in determining that question. (*Tucker* v. *Shaw,* 158 Ill. 326; *Brooks* v. *Bruyn,* 18 id. 539.) It is not always necessary that land be enclosed with a fence or a house erected upon it to constitute possession or that all characters of land must necessarily be reduced to cultivation. The rule is that such improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who is exercising the exclusive control and management of land will be deemed sufficient to constitute possession, (*Bugner* v. *Chicago Title and Trust Co.* 280 Ill. 620,) and where property is so situated as not to permit the erection of permanent, useful improvements, a claim of ownership evidenced by

public acts of ownership such as one would exercise over property of that character which he claimed in his own right and would not exercise over property which he did not claim to own may constitute actual possession. (*Burns* v. *Curran,* 282 Ill. 476.) As was said in *Lucas* v. *Ferris,* 95 Conn. 519, 12 Atl. 165: "Very much less actual use of this island is necessary to establish a claim of ownership than would be the case of a tillable farm, for example. The island was never used by anyone to any very great extent. The location and condition of the land must be taken into consideration and the alleged acts of ownership must be understood as directed to those circumstances and conditions." The same was said in *Beeney* v. *Miller,* 149 Mo. 228, 50 S. W. 824. This rule was likewise recognized in *Bellefontaine Co.* v. *Niedringhaus, supra.* The land on this tow-head did not admit of fencing or permanent buildings since at high stages of water it was inundated, as was the island. The acts of ownership of appellants and their grantors were such as the character of the land would permit and continued for more than the statutory period of limitation.

There is another basis for the relief sought by appellants. It has been consistently held in this State as a rule of property that the fee to lands bordering on the Mississippi river extends to the middle line of the main channel of that river. (*Middleton* v. *Pritchard,* 3 Scam. 510; *Houck* v. *Yates,* 82 Ill. 179; *Village of Brooklyn* v. *Smith,* 104 id. 429; *Buttenuth* v. *St. Louis Bridge Co.* 123 id. 535.) Island No. 55 was conveyed by United States patent as a separate tract of land, and in this is to be distinguished from those islands which appear between the mainland and the middle thread of the stream, the rule being in the latter case that such islands belong to the mainland adjacent. Where an island is separately surveyed, as was Island No. 55, and sold by the government as an independent tract, the grantee under such patent acquires riparian rights to the middle thread of the stream on each side of the island, two *fila aquæ*

being established, one filum on each side of the island. (*Stolp* v. *Hoyt,* 44 Ill. 219; *Hopkins Academy* v. *Dickinson,* 9 Cush. 544; *People* v. *Canal Appraisers,* 13 Wend. 355; Washburn on Real Property, 667; Angell on Watercourses, 14.) An incident to riparian rights is the right to accretions which become a part of the land to which they are added. Such accretions follow whatever title covers the mainland, whether it be by deed or title by adverse possession; and this is true even though the accretions so connected may at times be free from water and at times submerged. *Bellefontaine Co.* v. *Niedringhaus, supra.*

The chancellor found, and no exception is taken here to his finding, that appellants have acquired title by adverse possession to all of Island No. 55 lying north of the boundary line between sections 1 and 36. On the expiration of the limitation period the holder of land by adverse possession becomes possessed of a vested right or title relating back to the inception of his possession. His title can be defeated only by his conveyance of the land to another or by a like disseizin for the limitation period. (*Bellefontaine Co.* v. *Niedringhaus, supra;* 1 R. C. L. sec. 5, p. 690.) Since the record shows that when the Fullers took possession of Island No. 55 it extended for more than a quarter of a mile north of the line between section 36 and section 1, it follows that the thread of the stream of the east branch of the Mississippi river at that time existed midway between Turner Island and the mainland of Calhoun county for the full length of Island No. 55. The appellants, as holders of the title to the north end of the island, by the same means and at the same time became vested with riparian rights extending to the middle .thread of the channel between the island and the east shore. Having acquired title to the island by adverse possession they were entitled to the riparian rights incident thereto. The evidence is undisputed that while the tow-head during low stages of water is connected with Island No. 55, it is ap-

proximately 900 feet from the shore of the mainland, with water of substantial depth at all times between them. All of the tow-head lies west of the middle thread of the stream between the island and the mainland. This court has many times held that the owner of riparian rights in the bed of a stream is entitled to all islands that may spring up or be built up on the bottom of the stream between the shore boundary of his land and the *filum aquæ* in front of the same. (*Sikes* v. *Moline Consumers Co.* 293 Ill. 112; *Stolp* v. *Hoyt, supra; Middleton* v. *Pritchard, supra.*) The evidence shows that practically all of the tow-head lies east of the north part of Island No. 55 and in section 36.

Counsel for appellees contend, however, that the rule as to riparian rights does not apply as to accretions up or down-stream from an independent island, but that when Island No. 55 extended into section 36 the owner of the island acquired no riparian rights as to the portion of it in that section. Without deciding the right to accretions extending up and down a river where such accretions extend over a part of the bed of the stream opposite the mainland owned by another, it is evident here, as the chancellor found, that the appellants have title by adverse possession to that portion of the island which had grown by accretion up-stream into section 36 and so across the bed of the stream claimed by counsel to have been a part of the land in the so-called southwest quarter of section 36. Under the authorities cited in this opinion it is clear that having by adverse possession acquired title to this portion of the island, that title carried with it the riparian rights to such islands or accretions as appeared in the bed of the east branch of the river west of the middle thread thereof. This conclusion is inescapable, since riparian rights, as recognized in the law, are based mainly upon the right of access to the water, otherwise the owners of land in or along a stream or body of water might readily, by losing their frontage by accretion, be debarred of valuable rights

for which there would be no adequate redress. *Brundage v. Knox,* 279 Ill. 450.

Appellees argue that this bill may not be maintained because the record shows that appellants were not in possession and there was no claim that the premises are vacant. The record shows that appellants since the year 1915 have gathered numerous crops from the tow-head and have endeavored to keep all persons off. The fact that appellees went on the island and refused to get off is not sufficient to show that appellants were not in possession, since the wrongful presence of trespassers is not of itself sufficient to destroy the possession in appellants, and the fact that appellants did not use force to eject appellees from the tow-head does not deprive them of the right to try out their rights of property in equity.

Appellees argue that under their deeds and payment of taxes they are entitled to retain possession of the tow-head. The facts concerning the matter of taxes are, that the county clerk, who is one of the appellees, in 1928, since this controversy arose, by arrangement with other appellees placed the tow-head on the tax books as a part of the southwest quarter of the section described, notwithstanding there does not appear to have been such a description by government or other survey. His act in that connection is not of itself sufficient to support a claim of payment of taxes under color of title.

We are of the opinion that the chancellor erred in refusing to grant the relief prayed in the bill.

The decree is reversed and the cause remanded, with directions to enter a decree granting the relief prayed.

*Reversed and remanded, with directions.*