JOHN M. HENDERSON III, ADM'R OF THE ESTATE
OF J. M HENDERSON JR. *v.* FIRST NATIONAL
BANK OF DEWITT, ARKANSAS, AND HATTIE BOONE
BLACK

73-2                                    494 S.W. 2d 452

Opinion delivered May 14, 1973
[Rehearing denied June 11, 1973.]

*Macon, Moorhead & Green,* for appellant.

*Coleman, Gantt, Ramsay & Cox,* for appellees.

CARLETON HARRIS, Chief Justice. This case involves the obtaining of title to personal property by adverse possession, and apparently is the first reported case relating to such a situation for over one hundred years. The contentions of the parties are as follows:

On January 24th, 1928, First National Bank of De-Witt, Arkansas, issued to J. M Henderson, Jr. its Common Stock Certificate No. 186 for 20 shares.

J. M. Henderson, Jr. brought this action in the Circuit Court for the Southern District of Arkansas County, Arkansas, seeking recovery of possession of Certificates 186 and 198 from Miss Hattie Boone Black, and recovery

of 160 shares of dividend stock and $8,250.00 in accumulated money dividends from First National Bank of DeWitt. Hattie Boone Black answered with a general denial, and pleaded the statute of limitations, and later laches and estoppel as a defense, also moving to transfer to equity. Henderson replied, *inter alia,* pleading counter-estoppel, and joined appellee Black in her motion to transfer. First National Bank of DeWitt has taken a neutral position. This cause was transferred to equity.

During the course of the litigation, J. M. Henderson, Jr. died and the cause was revived in the name of his Administrator, John M. Henderson, III, the appellant.

The dispute centers around Henderson's original acquisition of Certificates 186 and 198, whether Henderson and L. A. Black (father of appellant Hattie Boone Black) had a property settlement in the fall of 1945 out of which Henderson was to take the certificates free of debt after having pledged them to L. A. Black, whether certain correspondence and transactions which occurred in 1950 and 1951 would start the running of the three year statute of limitations against Henderson, and whether certain acts and omissions on the part of the appellant, Hattie Boone Black, and her mother, Mary B. Black, would be sufficient to bar Miss Black from pleading the statute of limitations, laches and estoppel as a defense. Appellant, without conceding that he was barred by limitations from recovering possession of Certificates 186 and 198, also contended that as to the dividend stock and money dividends issued to John M. Henderson, Jr. and held by First National Bank, Miss Black could not in any event claim the bar of limitations, laches and estoppel, having never been in possession of these certificates and monies.

A number of witnesses testified and the record is rather large; at the conclusion of the testimony, and after the submission of briefs, the court rendered a comprehensive written opinion[1] discussing the contentions of

---

[1]For brevity, the court used the term "Henderson" referring to J. M. Henderson, Jr.; "Bank" referring to the First National Bank of DeWitt; the term "Defendant" referring to Hattie Boone Black; and "Black" referring to L. A. Black.

the parties and we will quote freely from that opinion in setting out the facts and law relied upon by the court in rendering its decision. The opinion commenced as follows:

"There are certain relevant facts that are not in dispute. It is undisputed that in January, 1928, Henderson was issued twenty shares of stock in Bank represented by certificate number 186 and in January, 1934, he was issued twenty more shares in Bank represented by certificate number 198. This was done at the instigation of Black, the then president and principal stockholder.

"The certificates were endorsed by Henderson in blank[2] and, even though Henderson testified that they were placed in the stock book, they apparently did not remain there for very long because Lawrence Dearing, president of Bank, testified that he had been associated with Bank for many years and he could not recall ever seeing the certificates in the stock book. The evidence would sustain a finding that Black and then his widow and then his daughter, the Defendant herein, have had the physical possession of the two stock certificates for most of the time subsequent to the date when Henderson endorsed them in blank.

"It is also undisputed that additional shares have been issued as stock dividends on the stock certificates in dispute in addition to cash dividends of $8,250.00. These stock and cash dividends have been held by the Bank since 1951, and the Bank, in this case, simply seeks instructions as to which party is the owner and entitled thereto.

"For the sake of clarity, the Court will discuss the principal issue under three topic headings in question form, i.e., (I) Did Henderson originally contract to purchase the forty shares represented by cer-

[2] According to Henderson, the forty shares were assigned to him out of stock belonging to Black for the sum of $2,000, said sum of money being in the nature of a loan; the endorsement in blank by Henderson was for the purpose of securing to Black the advance for the stock purchase.

tificate numbers 186 and 198? (II) Did Henderson receive these shares in a settlement with Black or otherwise pay the agreed price for them? (III) Is Henderson's personal representative now barred from recovering these certificates and dividends by the statute of limitations, laches or estoppel?

"These topic headings will be discussed in the order listed."

Proof on the part of appellee was directed to the fact that L. A. Black simply made the transfers of stock as a book transfer to enable Henderson to continue serving on the board of directors of the bank, but the court rejected this contention, stating that a finding to that effect would mean that the court was placing "the stamp of charlatan upon two men who lived most of their lives in Arkansas County and commanded the very highest respect from their fellow citizens"; that if this were only a "book transfer", the two men would have been violating the National Banking Act which requires that a director of a bank be "the owner in good faith, and in his own right, of the number of shares of stock required by this chapter. . .". The court stated:

"In the absence of more proof than is now in the record, this Court must reject any suggestion or implication that Black and Henderson descended to the status of a knave and engaged in chicanery solely for the purpose of retaining Henderson on the Board of the Bank. To the contrary, the evidence is rather clear that Black arranged for Henderson to acquire additional stock in 1928 and again in 1934 in order that Henderson would 'own in his own right' the minimum required by law. ***

"The Court finds that Henderson, in good faith, became the beneficial as well as the legal owner of the forty shares purchased in 1928 and 1934. The evidence further reflects that Henderson did not pay Black in cash at the time of acquisition, but the parties agreed that Black could receive the dividends, if any, from the stock until Henderson paid for them."

The court held that parol evidence was admissible to explain the circumstances surrounding Henderson's blank endorsement of Certificates 186 and 198, and then stated:

"(II) *Did Henderson receive these shares in a settlement with Black or otherwise pay the agreed price for them?* According to Henderson's testimony taken by deposition, he and Black had done business together for many years and in October, 1945, just two months before Black died, they had a complete settlement of their affairs. In this settlement, according to Henderson, he (Henderson) was to receive free and clear of any claim or encumbrance of Black stock certificate numbers 186 and 198." \*\*\*

"The Defendant introduced into the record certain ledger sheets reflecting certain transactions between Black and Henderson. If the Court accepted these ledger entries as containing the complete business affairs and transactions between Black and Henderson, then a holding would have to be made for Defendant in this case. Defendant Black's Exhibit No. 11 reflects five entries for 1945, the first entry reading: 'Jan. 1—To Balance—$3970.44.' The other debit entries are: March 16—Hardware—$1.40; Dec. 24— to check—$1500.00; and Dec. 31—to hardware— $12.39. Only one credit entry appears and that was on Dec. 24—'By Exp.—Atty Fee & Abstracting,'— $2000.00. The balance owed Black from Henderson at the end of the year, according to this ledger sheet, was $3484.23.

"The important question is: Did Henderson and Black have business transactions and dealings that never found their way to ledger sheets and other business records? If Henderson is to be believed, they did. Even though Henderson's testimony at times is a bit indefinite on details—and this is understandable since he was approaching ninety years of age when he gave his deposition—his overall testimony has a ring of truth about it. Henderson's testimony relating to the business dealings between himself and Black have not been disputed, with the exception of the

disputed stock certificates. Henderson testified that he and Black acquired a printing company in the late 1920s or early 1930s and that both put up $1500.00 in cash each. Among the assets of this printing business was some real property. According to Henderson, Black received this real property and the other assets of the printing company and he (Henderson) was to get the Bank stock free and clear of any claim by Black. Henderson's testimony implies that Black desired to remain a silent partner or owner in this printing business.

"The decisive evidence as to whether Henderson acquired the disputed Bank stock free and clear of any indebtedness to Black is found in the manner in which the interested parties dealt with and treated certificate numbers 186 and 198 following Black's death in late December, 1945."

The court then listed several facts that it considered vital in determining ownership of the stock. First, it was pointed out that the disputed shares of stock were not listed in the estate tax return filed in the estate of L. A. Black. Second, the court mentioned that the disputed shares were not listed in the estate tax return of Mrs. Mary B. Black, wife of L. A. Black. Third, quoting the court, "There is some evidence that the disputed shares of stock were not listed in the inventory of the estates of either L. A. Black or Mary B. Black." Fourth, Henderson paid federal income tax on certain dividends from the stock represented by Certificates 186 and 198, or from stock that in itself was originally a dividend from those two certificates. Fifth, Henderson had remained on the board of directors until his death, and would not have been eligible to serve in the absence of his ownership of the disputed stock certificates, and finally, Henderson exercised the rights of ownership by voting the disputed shares of stock at stockholders' meetings throughout the years.

The court then went into the question of whether Henderson's personal representative was barred from recovering the disputed shares because of the statute of limitation, laches and estoppel. After a discussion of ad-

verse possession and the statute of limitations, the court stated:

> "The rule involving the inseparable connection between the statute of limitations and the principle of adverse possession is well stated in 54 C.J.S., Limitations of Actions, Sec. 119: 'In suits to recover personal property, the statute of limitations and the principle of adverse possession are inseparably connected, on the theory that the statute does not begin to run until the possession becomes adverse, and a limitations statute relating to suits to recover personalty is affected by the doctrine of adverse possession by defendant.'
>
> "The Court holds that the Arkansas law is that not only the remedy has been cut off where there has been an adverse holder of chattels, but the title has been lost also.
>
> "The general rule is that ownership of a chattel may be lost or acquired through adverse possession. See 2 C.J.S., Adverse Possession, Sec. 236 and 1 Am. Jur., Adverse Possession, Sec. 96. *** Also, the general rule is that on the expiration of the limitation period, the disseisor becomes possessed of a vested right or title, and that title relates back to the inception of his possession. See 1 Am. Jur., Adverse Possession, Sec. 13."

The court also quoted 2 C.J.S., Adverse Possession, Section 203, to the effect that on the expiration of the limitation period, the holder by adverse possession becomes possessed of a vested right or title relating back to the inception of his possession. Further, from the opinion:

> "The decisive question of this case is: Has the statute of limitations run, thus effectively barring Plaintiff's cause of action? Another way to state the proposition is: Has the Defendant and her predecessors in title acquired the disputed stock certificates and/or dividends by adverse possession?
>
> "The Plaintiff's action was originally filed as a replevin suit in the Circuit Court of Arkansas

County. It was subsequently transferred to Chancery Court. The pertinent limitations statute applicable here is Ark. Stats. 37-206 and under this section 'all actions for taking or injuring any goods or chattels' must be brought within three years after the cause of action has accrued. \*\*\*

"In order for the statute of limitations to begin to run in this case, it was necessary that Henderson make a demand for delivery to him of the certificates and that this demand be refused or that Henderson be put on actual notice that the Blacks' holding was adverse and hostile to the claim of Henderson.

"Since the Court has held that Henderson received the disputed stock certificates in the settlement with Black in October, 1945, the fact that the physical possession of the certificates was in Black or his personal representative or the Defendant would not, in itself, deprive Henderson of his title.

"The parties introduced certain correspondence from Henderson and Mrs. Mary B. Black to the Bank, and correspondence from the Bank to Henderson and Mrs. Black. There are four letters from Henderson to the Bank and one letter from Mrs. Black to the Bank. Until October 16, 1969, Henderson never demanded of either the Defendant, her mother or the Bank a return or delivery to him of the stock certificates or cash dividends in possession of the Blacks or the Bank. On that date, he wrote to the Bank formally demanding delivery to him of all stock and cash dividends held by the Bank. The Bank responded that it would not be able to meet Henderson's request 'except on a judgment of a court of competent jurisdiction.' Henderson filed suit the following month.

"On January 5, 1951, Mrs. Mary B. Black, writing as the executrix of the estate of L. A. Black, addressed a letter to the Bank in which she stated: 'I hand you herewith for transfer and re-issue to me Stock Certificates Nos. 186 and 198, each for

twenty shares of stock of The First National Bank of DeWitt.' Mrs. Black requested the Bank to transfer these shares to her and to issue new certificates therefor. The Bank, under the same date, advised Mrs. Black that it was 'returning herewith the Stock Certificates pending settlement of the ownership of the Stock in the Bank between you as Executrix of the Estate of L. A. Black, and J. M. Henderson, Jr.'

"In the letter from C. P. Chaney, President of the Bank, dated January 5, 1951, to Mrs. Mary B. Black, the following statement is found: 'I have talked with Mr. Henderson and he asks that the transfer on the Bank's records be not made at this time. For this reason I am returning herewith the Stock Certificates pending settlement of the ownership of the Stock in the Bank between you as Executrix of the Estate of L. A. Black, and J. M. Henderson, Jr.'

"Henderson, in his deposition, testified that sometime prior to August 29, 1950, one Charlie Ruffin told him that 'they (meaning the Blacks) had the stock, that's how I got it.' He further testified that the letter of August 29, 1950, was written shortly after Charlie Ruffin gave him that notice. Henderson testified further that 'he (Ruffin) told me that they had found them (disputed stock certificates nos. 186 and 198) the day before in the bottom of Black's desk, that what he told me.' He further testified that Ruffin told him, 'They are going to give you trouble about those certificates' and he asked me if I sold my certificates and said they were going to give me trouble about them and I wrote that letter to the bank.' Henderson further testified that in 1951 one Clay Shilling, field manager for the Black estate at that time, presented the disputed certificates to the Bank's Board of Directors 'for the purpose of having stock certificates issued, the Bank had notified the stockholders that the stock certificates were going to be issued.' He testified that he was present when Shilling presented the certificates to the Board to

be reissued and that he (Henderson) said to Shilling at that time, 'Those are my stocks,' and he (Shilling) said, 'Well, I don't know anything about it, she sent me down here with them.' Henderson testified further that since 1951 the stock and cash dividends have been held by the Bank because both he and Mrs. Black had given notice (of their respective claims) to the Bank. Then at the bottom of page 47 and the top of page 48 of his deposition, this question and answer appears:

'Q. In other words since 1951 Mrs. Black was claiming ownership of the stock, is that correct sir?

'A. That's what I understand.'

"By Henderson's own testimony, he knew as early as August, 1950 that Mrs. Mary B. Black had actual possession of the certificates of stock that he (Henderson) received in the settlement with Black and that she was claiming to own the certificates. He also knew that she was attempting to have the stock reissued by the Bank in her name. At that time, he was placed on notice that her possession was not a continuation of the original lawful possession but was hostile and adverse to his claim to the certificates. ***

"The Court holds that the Defendant and her predecessor in title have acquired the title to certificate numbers 186 and 198 by adverse possession and that Plaintiff's cause of action is barred in that his cause of action accrued in January, 1951, when Henderson was put on actual notice that Mrs. Mary B. Black was holding the certificates and claiming them as her own. ***

"Which party is entitled to the stock and cash dividends which have been held by Bank since early 1951? The Plaintiff contends that he has had constructive possession of some of these dividends and, therefore, is entitled to a portion of them. The Court cannot agree. As stated in *Bir-*

*mingham Securities Co.* v. *Southern University,* 55 So. 240, 173 Ala. 116, according to Words & Phrases: ' "Constructive possession" follows the legal title, the rightful owner being deemed in possession until he is ousted and disseised. Possession follows the title, in the absence of actual possession adverse to it.' As will be pointed out herein, the legal title to the original certificates from which the dividends were derived has been in the Defendant at all times that are material here.

"The record in this case reflects that the first stock dividend on certificate numbers 186 and 198 was sixty shares issued on January 31, 1951. The next stock dividend was for sixty shares issued on March 19, 1959 and the last stock dividend was for forty shares issued January 21, 1966. The first cash dividend was for $200.00 and this was paid December 31, 1951. There were other cash dividends up to and including a $500.00 cash dividend paid December 31, 1971. The Court attaches as an addendum to this opinion a list of all cash and stock dividends giving the amounts, number and dates.

"Since these dividends are all derivative of the forty shares represented by certificate numbers 186 and 198, their ownership will follow the ownership to numbers 186 and 198.

"Sixty shares of the dividend stock represented by certificate number 25 were issued at a time when title to the stock from which the sixty were derived was in Henderson. Also, some of the cash dividends were paid before the statute of limitations had run. However, as the authorities cited herein state, the title of the Defendant to the original certificates relates back to the beginning of her possession that was hostile and adverse to the possession and title of Henderson. This would be at a time prior to the issuance of any stock or cash dividends. Since this 'relation back' theory has the same effect as if Henderson had actually assigned all of his interest in the certificates to Mrs. Mary B. Black in January, 1951, the dividends declared during the

time and prior to the expiration of the running of the statute of limitations would also follow the title to the certificate numbers 186 and 198. The dividends declared after the statute of limitations had run would clearly, of course, be the property of Defendant.

"The Court holds that the Defendant is the owner of the cash and stock dividends being held by the Bank."

From the decree entered in accordance with this opinion, appellant brings this appeal. For reversal, five points are asserted but all really relate to two points as follows:

## I

"The Court erred in finding plaintiff's right of recovery and plaintiff's title to all of the bank stock and stock dividends involved in this action has been lost by the plaintiff as a consequence of the running of the three statute of limitations (Section 37-206 Ark. Stats.)."

## II

"The Court erred in failing to find from the evidence that the defendant, and her predecessor Mary B. Black, were guilty of such inaction, and delay on their part in asserting their claim of ownership and the right to possession of the stock in litigation as would in equity bar and estop defendant from pleading the statute of limitations, laches and estoppel as defenses to plaintiff's right of recovery of:

(1) Stock Certificates Nos. 186 and 198; and

(2) The dividend stock and money dividends which have remained in the possession of First National Bank of DeWitt."

These points, of course, are really linked together and will be discussed together.

## I

There is no dispute but that title to personal property can be acquired by adverse possession, nor is it disputed that the applicable statute of limitations is three years, i.e., adverse possession for more than that period of time would vest title in the adverse possessor. Only one Arkansas case on this point, involving a slave, was cited by the parties, but our research has resulted in revealing four cases relating to this question. All of these cases occurred prior to the Civil War and three of them also involved the ownership of slaves. The other case, *Hicks v. Fluit*, 21 Ark. 463 (1860), involved adverse possession of a horse and this court held that three years adverse possession "not only takes away the remedy from the original owner, but vests possessor with the absolute property". Some of the arguments made by appellant can be bypassed for it is certain from the record that J. M. Henderson, Jr. had knowledge that Mrs. Mary B. Black, widow and executrix of the estate of L. A. Black, was claiming the stock certificates as property of the estate as early as January, 1951. Actually, it would appear that he had knowledge some time prior to August 29, 1950, since he testified that one of the Black employees (Ruffin) advised him that Certificates 186 and 198 had been found in Black's desk and Henderson was told "They are going to give you trouble about those certificates." This evidence, unless there were other circumstances that prevented the running of the statute, certainly upholds the chancellor's finding that Henderson's cause of action was barred since he was put on actual notice that Mrs. Black was holding the certificates and claiming them. Appellant's argument is directed to the fact that because of the conduct of Mary Black and her daughter, Hattie Boone Black, appellee is estopped to raise the defense of the statute of limitations. The circumstances relied upon are that, though advised by the bank that it would not transfer the stock because Henderson objected, neither Mrs. Black, nor Hattie Boone, took any steps against Henderson; further, that Henderson voted the stock during all the years preceding the filing of the lawsuit with the knowledge of the Blacks.

We see no great significance in this last mentioned. Hattie Boone testified that she had been a stockholder in

the First National Bank since the death of her father, but that she had never attended a stockholders' meeting and that neither she nor her mother had any objection to Mr. Henderson serving on the board of directors. "He was on there when Daddy was living. She was glad for him to be on there in her lifetime and I was, too. . . . He had been on there all those years and we were happy for him to serve and didn't want to cause any disturbance." Of course, during the entire time, the contested stock, endorsed in blank, was in the possession of the Blacks, and if they were not interested in voting the stock themselves, there was no reason to complain. Certainly, Mr. Henderson was not lulled into the belief that the Blacks were not claiming the stock simply because no objection was raised to his voting the stock, for the bank during this period of time, was withholding the stock dividends and cash dividends because of the claim of the Blacks, and Henderson was certainly also aware that the original stock certificates were in the possession of appellee under a claim of ownership.

We do not agree that the fact that no legal action was instituted against Henderson by Mrs. Mary Black, or appellee, for the eighteen year period (between 1951 and 1969) estops appellee from claiming the defense of the statute of limitations. In the first place, let it be borne in mind that the period of time that is actually pertinent is that period from January 1, 1951 to January 1, 1954 and the record does not reveal very much, other than what has already been mentioned about the actions of the parties (relative to the stocks) during that time. Appellant's argument is largely devoted to the acts of the parties during the full eighteen year period (1951 to 1969). The Blacks had the stock in their possession, not only the stock itself, but it bore the endorsement in blank of Henderson. What action could they have taken against Henderson? Of course, had he been holding the stock with them also claiming it, it would have been necessary to institute suit. But under the circumstances, there was nothing to be gained by suing Henderson, and really nothing to sue him about. The only party that was withholding anything from the Blacks was the bank, and the bank has not pleaded delay; in fact, as previously stated, the bank is merely sitting in the middle awaiting the outcome of

litigation between Henderson and appellee. On the other hand, Henderson was in dire need of the stock certificates before he could pursue his quest for monetary benefits. According to the finding of the court, Henderson, after the settlement in 1945, was the owner of the certificates, and it was his duty to seek possession of his property. There is a discussion of estoppel in *American Casualty Company* v. *Hambleton,* 233 Ark. 942, 349 S.W. 2d 664. There, we said:

> "Elements of 'estoppel' arising from nondisclosure are ignorance of party claiming estoppel, silence of other party where there is duty to speak amounting to misrepresentation or concealment of material fact, action by party relying on the misrepresentation or concealment, and damages resulting if estoppel be denied. *Nelson* v. *Chicago Mill & Lumber Corporation,* 76 F. 2d 17 (C.C.A., Ark. 1935)

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights of property, contract or remedy, which might otherwise have existed, as against another person who has in good faith relied thereon and been led to change his position for the worse. *Geren* v. *Caldarera,* 99 Ark. 260, 138 S.W. 335 (1911).

> "A party who, by his acts, declarations or admissions, or by failure to act or speak under circumstances where he should do so, either designed or with willful disregard of interest of others, induces or misleads another to conduct or dealings which he would not have entered upon but for such misleading influence, will not be allowed, because of estoppel, afterwards to assert his right to the detriment of person so misled. *Dobbins* v. *Martin Buick Co.,* 216 Ark. 861, 227 S.W. 2d 620; *Williams* v. *Davis,* 211 Ark. 725, 202 S.W. 2d 205; *Rogers* v. *Hill,* 217 Ark. 619, 232 S.W. 2d 443."

Is Miss Black estopped under the rules of law just set out? We think not. Henderson was not ignorant of the fact that the certificates were held and claimed by the

Blacks. Mrs. Mary Black had made it clear that claim was being made, and Henderson, by his own admission, was aware of this fact from several different sources. According to Henderson's own evidence, nothing was said by either Mrs. or Miss Black amounting to a misrepresentation[3], nor did they seek to conceal the fact that they had the stock. Having made it clear that they were claiming the certificates as their own, there was no further duty to say anything else. Yet, Henderson though contending ownership of the stock, and even paying tax on dividends which he had not received, sat for eighteen years before instituting suit to regain the certificates and this despite the fact that he was an attorney, and had also received a suggestion that suit be instituted.[4] Accordingly, we find that the conduct of the Blacks did not induce or mislead him into inaction, nor did Henderson so contend in his testimony.

## II

Here, admittedly by appellant, "new ground" is being plowed. No cases are cited by appellant in his brief, and counsel, during oral argument, candidly and frankly conceded that no cases had been found to support appellant's view.

It might be here stated that there is no contention if appellee was not estopped to claim the statute of limitations, and thus acquired title by adverse possession, but that such title relates back to the commencement of the

---

[3]The record reflects the following question and answer during direct examination of Henderson.

"Q Now at any time since 1945 have you had any communications either verbal or written with Miss Hattie Boone Black with respect to this stock? A Not a word."

He had previously stated that he had not talked with Mrs. Black with regard to the stock.

[4]From the record:

"Q At any time since 1945 have you had any communication either verbal or written with respect to this stock with Mrs. Georgea Black McKinley? A No. She talked to me about it some and insisted that I file suit and get it straightened out."

running of the statute.[5] The argument that appellee has not acquired the dividend stocks and cash dividends is simply based on the contention that the Blacks never, at any time, had possession of the dividend stock or cash dividends, and accordingly could not have acquired adverse possession of those items. While no cases are cited by either appellant or appellee involving the exact issue here present, i.e., the title to derivative stock and cash dividends, we think logic compels the view that title to this stock vests in that person who owns the original stock, unless there is an agreement to the contrary. This is certainly the law as far as the ownership of animals is concerned, i.e., the owner of the cow owns her calf. *West v. Ankey*, 134 N.E. 2d 185 (Ohio), and *John Deere Plow Co. v. Gooch*, 91 S.W. 2d 149 (Mo.). Analogous is the law that one who acquires title to land by adverse possession is entitled to all accretions to said land. *Bellefontaine Imp. Co., et al v. Neidringhaus, et al*, 55 N.E. 184 (Ill.). Were the court to hold with appellant in this contention, such holding might well result in extending *ad infinitum* the tolling of the statute. As pointed out by appellee, where a person's stock had been converted, no matter how many years previously, that person would have a continuing cause of action each time that a cash or stock dividend was declared on the stock. The trial court correctly held that, since the title obtained by adverse possession by appellee related back to the beginning of her hostile possession, and since this occurred before any of the stock or cash dividends here at issue were payable, such dividends belong to appellee.

Inasmuch as we agree with the chancellor in his findings relative to adverse possession, there is no need to discuss the question of whether the court erred in holding that Henderson had met the burden of proving his claim of ownership of the original shares, though this

---

[5]In 3 Am. Jur. 2d, § 242, page 342, we find:
"It is a general theory underlying adverse possession that once the title is matured it relates back to the beginning of the adverse holding; and under such theory it is presumed that the origin of the title was rightful, not wrongful, that the possession which has matured it was in support, not in derogation of the rightful title, and that he who by a possession perfect in the law has matured a title has in theory of law been the owner of the title from the beginning."

question is forcefully and persuasively argued by appellee.

On the whole case, we find no reversible error.

Affirmed.